OSHA THOMAS,              )
                          )     NO.
     Plaintiff,         )
                          )     JURY DEMANDED
v.                     )
                          )
PERSEVERE, INC.     )
                          )
     Defendant.      )

---

## COMPLAINT

---

COMES NOW the Plaintiff, Osha Thomas ("Plaintiff") by counsel, and for her Complaint against Defendant Persevere, Inc. ("Defendant" or "Persevere"), states as follows:

### I. PARTIES

1. Plaintiff is a citizen of Hamilton County, Chattanooga, Tennessee and worked in Hamilton County at all times relevant to this Complaint.

2. Defendant is a Utah non-profit corporation with its principle place of business in Bountiful, Utah.

3. Defendant conducts significant business in Hamilton County, Tennessee and employs a number of individuals across the state of Tennessee.

4. Defendant employs more than 200 individuals and is covered by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, et seq., the Tennessee Human Rights Act, Tenn. Code Ann. §4-21-401 et seq., and 42 U.S.C. §1981.

5. Defendant benefits from federally funded grants that, upon information and belief,

prohibit discrimination and retaliation on the basis of race.

## II.  JURISDICTION

6.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, because Plaintiff is asserting claims based upon federal law as alleged herein.

7.      The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. 1332 because there is complete diversity of citizenship among the parties herein.  Plaintiff is a citizen of the state of Tennessee.  Defendant is a citizen of the state of Utah.

8.      In this lawsuit asserting federal claims, Plaintiff also alleges violations of companion state laws, including the Tennessee Human Rights Act, Tenn. Code Ann. §4-21-101, et seq. and this Court has supplemental jurisdiction over the same pursuant to 28 U.S.C. §1367.

9.      The acts complained of herein took place in Hamilton County, Tennessee.  Venue is appropriate in this Court and Division.

## III.  STATEMENT OF FACTS

10.      Plaintiff is an African American female.

11.      Plaintiff began working for Defendant on January 3, 2023, as a Lead Case Manager. As a Lead Case Manager, Plaintiff was responsible for supervising case managers in East Tennessee and managing a caseload of clients by providing onboarding into the Tech Alliance Program and supportive services to assist with their case plans.

12.      Defendant is a company that provides training, education, and assistance to incarcerated or recently released individuals to help them acquire technology and other life or work skills, education, healthcare, and other assistance.

13.      Plaintiff was very qualified for her position.  Prior to working for Defendant, she obtained her bachelor's degree in Sociology and her master's degree in public administration.  She

2

also had lengthy experience with management, case management, residential and treatment experiences, and mental health issues.

14.     Plaintiff's initial supervisor was Alexis Tressler, a Caucasian female.

15.     Ms. Tressler's mother, Stacey Books, served as the Chief Program Officer for Defendant.

16.      For the first year of her employment, Plaintiff enjoyed success in her career with Defendant.

17.     During that time, she did observe another employee who made complaints relating to diversity (and whether she as a minority was safe servicing one very non-diverse and apparently hostile neighborhood) to Ms. Tressler and Ms. Books.  Following those complaints, upon information and belief, that employee was criticized for her performance.

18.     Although Plaintiff performed successfully during her first year, she observed that Ms. Tressler scrutinized her performance more heavily than a similarly situated Caucasian Lead Case Manager, Kayse Gann.  For example, Ms. Tressler criticized trainings offered by Plaintiff and asked her to get approval for all she planned/conducted, whereas she was enthusiastic about trainings offered by Ms. Gann and did not require prior approval.  The difference in treatment occurred publicly and in group meetings.

19.     Plaintiff also observed in that year that Ms. Tressler acted negatively towards another African American Lead Case Manager, Cecilia Reed.  At one point, Ms. Tressler told Plaintiff that she and Ms. Reed were poorly perceived, claiming it was because Ms. Reed was quiet. Ms. Tressler never specified why she said that about Plaintiff or grouped her with Ms. Reed in a stereotypical manner.

20.     On January 5, 2024, Ms. Tressler conducted a regular meeting among the Lead

Case Managers.  Nothing was mentioned about any promotional opportunities in the meeting.

21.     However, unbeknownst to Plaintiff and Ms. Reed, a brand-new position had been created for Case Manager Supervisor and was posted to the company website that day.  In fact, on or around that time, two postings were created internally for the same job- one marked to be posted in the regular manner (#231) and one marked to be posted only internally (#232).  This was unusual.  The one marked to be posted in the regular manner was not posted until February.

22.     Ordinarily, when Defendant had job postings, it would post them to Indeed and to the company website and would discuss them openly in meetings and company newsletters.  That was especially true when brand new positions were created.

23.     However, this position was not discussed or mentioned and the only one of two positions created that was posted in January was only posted on the website (#232).  It was not an opening necessitated due to another employee's leaving, so nobody would have been aware of it unless they just happened to look at the website or they had been told about it.

24.     Plaintiff later learned that Ms. Gann had been invited to a Huddle meeting on January 3 with Ms. Books, Ms. Tressler, and others.  Upon information and belief, the job opening was discussed in this meeting.

25.     Ms. Gann applied for the position the day it was posted on the company website— January 5, 2025.

26.     Plaintiff and Ms. Reed did not learn about the open position until after it was filled.

27.     The Case Manager Supervisor job was a promotion, both in pay, position level, and prestige.

28.     According to the posted job advertisement, the job required possession of a bachelor's degree.

29. Ms. Gann did not possess a bachelor's degree, whereas Plaintiff had both a bachelor's and master's degree.

30. In a Tech Alliance Team meeting on February 2, 2025, Ms. Tressler announced that the position had been posted and that Ms. Gann had been selected for it on January 22, 2025.

31. The promotion of three additional Caucasian employees was also announced in this meeting. No African Americans were promoted.

32. Plaintiff participated in the February 2, 2025 meeting and was shocked when she learned of the new position and that it had already been filled by Ms. Gann.

33. In the meeting, another minority Lead Case Manager questioned the process employed in this promotional decision. In response, she was told that Ms. Gann was the "best fit."

34. The lack of posting and discussion about the position was not consistent with Defendant's ordinary processes and was also not in keeping with new guidelines communicated to staff in October 2023 by the HR Director, Jane Rowland. According to her email, Defendant was going to take affirmative action to expand its diversity and recruit minorities for open positions and promotions. A number of new affirmative action policies were distributed related to hiring and promotion.[1]

35. Instead, with respect to this position, the minority candidates were specifically excluded and instead, a non-qualified Caucasian was hand selected.

36. During the February 2 meeting when the Gann promotional decision was questioned, Plaintiff nodded in agreement, which was noted by Ms. Tressler, and then also questioned whether they would get certain reports or data.

37. In response, Ms. Tressler became very hostile and aggressive towards Plaintiff.

---

[1] These policies were then revised after Plaintiff filed her EEOC charge.

When Plaintiff requested that certain metrics be provided relevant to certain assignments, Ms. Tressler was ugly towards her, saying "I'm not making a report for that, Kayse you can make a report if you want to, "she wants a report with every phone call, every email, every text…"  The hostility continued for about 8 minutes.

38.     As a result of the promotional decision and meeting Plaintiff emailed HR on February 2, 2024, to complain and respectfully request an investigation.  Ms. Rowland responded on February 3, 2024, requesting additional information.

39.     As such, on February 5, 2024, Plaintiff provided a detailed accounting of the meeting.  She also asserted in her email that she believed she was not given equal opportunity to apply to the role due to discrimination and asked HR to ensure protection against harassment or retaliation.

40.     Following Plaintiff's complaint, Ms. Books began reaching out to Plaintiff directly asking her to perform tasks.  This was very unusual and had not occurred previously.

41.     Also following Plaintiff's complaint, Defendant posted externally job #231. Plaintiff and others applied for it.  Ms. Rowland sent Plaintiff an email indicating that the job posting was unknowingly created twice and had been filled in January.

42.     In February of 2024, Ms. Tressler continued to criticize Plaintiff in front of the rest of the team.  She also changed certain standard operating procedures ("SOPs") in that period.

43.     As a result, on February 21, 2024, Plaintiff asked if she could limit her interactions with Ms. Tressler.

44.     Plaintiff had a virtual meeting with Ms. Rowland on March 7, 2024, and affirmatively stated that she believed she had been discriminated against because of her race and objected to the same.

45.     In expressing her concerns outlined herein, Plaintiff engaged in protected activity.

46.     Ms. Rowland concluded her investigation and conveyed her findings to Plaintiff virtually on March 8, 2024, and then by email on March 18, 2024.  Ms. Rowland said that she concluded that Ms. Gann was the only internal candidate who applied and claimed that Ms. Gann was not tipped off about it in advance or given any unfair advantage.  With respect to the February 2 meeting, Ms. Rowland indicated that she interviewed 3 witnesses, one of whom supported Ms. Tressler, one of whom was neutral, and one of whom felt that Ms. Tressler was hostile.  Ms. Rowland said she discounted the last person because she was "aware that you spoke with this individual before filing your complaint with HR and that could have skewed their perception."  As such, Ms. Rowland concluded that the matter was simply a "business conflict."

47.     On March 12, 2024, within 6 weeks of her original protected activity (which wea continuing in nature), Plaintiff was issued a Performance Improvement Plan ("PIP").

48.     She had no prior discipline with Defendant.

49.     Although Ms. Gann delivered the PIP to her, she made clear in so doing that she had been given that to go over with Plaintiff.  When Plaintiff asked for specifics with respect to cited alleged deficiencies in the PIP, Ms. Gann said that Ms. Tressler was on PTO, but she would try to find support for the general criticisms.  During the virtual meeting, Plaintiff could observe that Ms. Tressler was actively editing the document.

50.     Ms. Books was also an editor of the PIP and worked in close contact with Ms. Rowland.

51.     As a result of the PIP, Plaintiff's prestige was diminished, new rules were imposed on her in terms of PTO usage, she was treated poorly, and it contributed to her later termination.

52.     Shortly after the PIP was issued and, in an email, Plaintiff questioned Ms. Rowland

7

and Ms. Gann whether the PIP was an act of retaliation for her recent complaints of discrimination but indicated that she would do her best to perform in an optimal manner and follow all of their requirements.

53.     Following the issuance of the PIP, Plaintiff made an inquiry with the EEOC.

54.     Following issuance of the PIP and her continued protected conduct, Plaintiff was subjected to heightened scrutiny and tasks given to her had shorter deadlines than those given to comparators or those given prior to her protected activity.  Plaintiff was also subjected to critical messages in slack communications.

55.     In June and July 2024, other employees and comparators were given their performance evaluations.  Plaintiff was not.

56.     In July of 2024, Stacy sent an invitation for the "Chattanooga Team" to have a team lunch and Plaintiff was not included.

57.     Around this time, Plaintiff had also observed that her access to certain important data in the system was limited and the limitations prevented her from fully performing her job. When she realized that, she researched the access granted to other comparable employees and found that she and the other minority Lead Case Manager both had such limited access, whereas non-minority individuals were not limited in this manner.  This was because she and the other minority Lead were mislabeled in the system as "Case Managers."  Caucasians were, at a minimum, labeled with their appropriate titles and were thus given full access.  Plaintiff was stunned to learn that a Caucasian Case Manager she supervised was actually classified with the same label as Ms. Tressler—Program Services Coordinator.  Thus, Plaintiff's subordinate had higher level access as compared to her.  Plaintiff told Ms. Reed about that in August of 2024. Indeed, all African Americans in any leadership position were classified as "Case Managers" in

8

the system.

58. Plaintiff was then terminated on August 4, 2025, exactly 6 months after she first uttered the word "discrimination" to Defendant. She was not given any specific reason for her termination. She asked for one the following day from HR and was given no response.

59. Consequently, Plaintiff believes she was discriminated against due to her race and in retaliation for her protected complaints and objections to the same.

60. Plaintiff suffered damages as a result.

61. Plaintiff's efforts to mitigate her damages were obstructed by Defendant's post-employment restrictive covenants.

62. Plaintiff formalized her charge of discrimination pro se and in a timely manner on September 26, 2024 bearing charge number 494-2024-01991 and asserting claims for race and discrimination and retaliation. She received a Notice of Rights on July 23, 2025. This Complaint has been timely filed.

### IV. COUNT 1 – VIOLATION OF 42 U.S.C. § 1981

63. Plaintiff realleges all previous paragraphs and incorporates those paragraphs by reference as though fully set forth herein.

64. 42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts. This includes the making of, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

65. By seeking and remaining employed with Defendant, Plaintiff wished to make, continue, and enforce a contract with Defendant to include that her civil rights be honored and respected.

66. In committing the acts described herein, Plaintiff was denied the same by

9

Defendants, and other benefits, privileges, terms and conditions due her, due to or motivated by her race as an African American.

67. The racial discrimination and retaliation permitted by Defendant deprived Plaintiff of her rights, privileges and immunities, secured by the laws of the United States pursuant to 42 U.S.C. §1981.

68. As such, Defendant violated 42 U.S.C. § 1981.

69. Plaintiff suffered damages as a result.

### V. COUNT 2 – RACE DISCRIMINATION AND RETALIATION

70. Plaintiff realleges all previous paragraphs and incorporates those paragraphs by reference as though fully set forth herein.

71. Plaintiff has been treated in a disparate manner by Defendant due to her race.

72. Other African American employees have likewise been treated in a disparate manner.

73. Plaintiff was denied promotional opportunities due to her race.

74. The perpetrator of this conduct was a manager who directed Plaintiff's work and who impacted the terms and conditions of her employment.

75. Plaintiff complained about and objected to the same to Defendant and nothing was done to prevent or protect her or address the discrimination.

76. Instead, Plaintiff faced retaliation from Defendant for her protected complaints.

77. As she complained about the discrimination, she was subjected to ridicule and criticism.

78. This culminated in Plaintiff being given a PIP on the heels of her protected activity.

79. Plaintiff was then subjected to heightened scrutiny in retaliation for her complaints and objections to discrimination.

80. Plaintiff was eventually terminated as a result of this discrimination and retaliation.

81. Plaintiff has been damaged and continues to be damaged because of all the acts alleged herein.

82. As a result, Defendants have violated the Tennessee Human Rights Act and Title VII.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays as follows:

a. That the Court issue and serve process on Defendant and require Defendant to answer within the time prescribed by law;

b. That Plaintiff be awarded judgment for damages she has suffered from the date of Defendant's unlawful actions;

c. That Plaintiff be awarded compensatory damages, including damages for humiliation, embarrassment, grief, emotional distress, career damage, and injury due to the unlawful conduct described herein;

d. That Plaintiff be awarded punitive damages;

e. That Plaintiff be awarded attorney fees, court clerk costs, and litigation expenses, pre and post judgment interest, and such other and further relief as the Court deems proper; and

f. Plaintiff demands a jury to try all claims and issues triable by a jury.

11

Respectfully submitted,

MIKEL & HAMILL PLLC

By: ___*Donna J. Mikel*_____
       Donna J. Mikel, BPR#020777
       Attorneys for Plaintiff
       620 Lindsay St., Suite 200
       Chattanooga, TN 37403
       P – (423) 541-5400
       F – (423) 541-5401
       dmikel@mhemploymentlaw.com